## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

─────────────────────────────────────────────

UNITED STATES OF AMERICA,

        Plaintiff,


v.                             **MEMORANDUM OF LAW & ORDER**
                                     Criminal File No. 04-390 (MJD/JSM)

(1) WILLIAM D. PIERCE and

(2) SHIRLEY B. PIERCE,

        Defendants.

─────────────────────────────────────────────

Ann Anaya and John Marti, Assistant United States Attorneys, Counsel for Plaintiff.

Deborah Ellis, Ellis Law Office, Counsel for Defendant William Pierce.

Kate Menendez and Lyonel Norris, Federal Public Defender, Counsel for Defendant Shirley Pierce.

─────────────────────────────────────────────

## I.    INTRODUCTION

This matter is before the Court regarding the sentencing of Defendants William Pierce and Shirley Pierce. An evidentiary hearing was held on May 2, 2006. All parties have raised objections to the sentencing guidelines recommended by the Probation Office. Sentencing of the Pierces is scheduled for May 24, 2006. The Court issues the follow Memorandum of Law and Order in

advance of the sentencing.

## II.    BACKGROUND

On October 6, 2004, Defendants William Pierce and Shirley Pierce, husband and wife, were charged with the following crimes: Count 1, conspiracy in violation of 18 U.S.C. § 371; Counts 2-4, false tax returns in violation of 26 U.S.C. § 7206(1); Counts 5-8, mail fraud in violation of 18 U.S.C. § 1341; and Counts 9-13, wire fraud in violation of 18 U.S.C. § 1343.  A trial was held, beginning September 12, 2005.  On October 3, 2005, a jury found both William Pierce and Shirley Pierce guilty on all counts.

On February 3, 2006, the Probation Office submitted a presentence investigation (PSI) for each Defendant.  The applicable guidelines are calculated from the Guideline Manual incorporating amendments effective May 1, 2001.  The PSI recommended the following guideline range for each Defendant:

| | |
|---|---|
| Total Offense Level: | 22 |
| Criminal History Points: | 0 (Category I) |
| Imprisonment Range: | 41 to 51 months |
| Supervised Release: | 2 to 3 years |
| Fine Range: | $7,500 to $75,000 |
| Special Assessment: | $1,300 |

## III.   DISCUSSION

### A.    Introduction to the Offense Level

The mail fraud counts are grouped with the wire fraud counts under

2

U.S.S.G. § 3D1.2(d), and the false tax returns group is then grouped with the mail and wire fraud counts under § 3D1.2(c).

Count 1 charges conspiracy to commit tax fraud, mail fraud, and wire fraud. Under § 1B1.2(d), "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Furthermore, in this case, the Court, "were it sitting as a trier of fact, would convict the defendant[s] of conspiring to commit" each of the three object offenses. § 1B1.2, App. Note 4. Count 1 is grouped with the substantive offenses that were the object of the conspiracy; thus, Count 1 is included in both the mail and wire fraud group of offenses and the tax fraud group of offenses for guideline calculations. § 3D1.2(b), App. Note 8.

Under § 3D1.3(a), the final offense level is the highest offense level produced by either count group.

### B.    Tax Counts

#### 1.    Base Offense Level

The PSI recommends a base offense level of 13 for Count 1, conspiracy to commit tax fraud, and Counts 2-4, false tax returns, based on a tax loss of $55,701.00. §§ 2T1.1, 2T4.1(H), 2X1.1. The parties do not object to this base offense level, and the Court adopts it.

3

### 2.   Enhancement for Failure to Report Income Exceeding $10,000

The PSI applies a 2-level enhancement under § 2T1.1(b)(1) for failure to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity.  None of the parties object to this enhancement.[1]  Thus, the Court applies the 2-level enhancement.

### 3.   Obstruction of Justice Enhancement

#### a.   Introduction

The PSI did not apply an obstruction of justice enhancement because the trial transcript was not available at the time the PSI was prepared.  The Government seeks a two-level enhancement for obstruction of justice under § 3C1.1 for Shirley Pierce only under the tax fraud counts group.

This enhancement applies if "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstruction conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense."  § 3C1.1.

---

[1]Although William Pierce initially objected to this enhancement as noted in the Addendum to the PSI, the Court considers this objection withdrawn because, in his sentencing position paper, Mr. Pierce stated that the Court should adopt the PSI's recommended offense level, which included this enhancement.  To the extent that any objection noted in the Addendum to the PSI was contradicted by counsel in their position papers or later at the evidentiary hearing, the Court considers that objection withdrawn.

Committing perjury or producing "a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" will constitute a basis for this enhancement. § 3C1.1, App. Note 4(b), (c).

> Lying under oath certainly impedes the administration of justice during the prosecution of a case. A defendant is subject to an obstruction of justice enhancement if he gives false testimony under oath in regard to a material matter and does so willfully rather than out of confusion or mistake. **A defendant's testimony should be evaluated in the light most favorable to him.**

United States v. Scott, 91 F.3d 1058, 1063 (8th Cir. 1996) (citations omitted) (emphasis added). "[I]naccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory, and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." § 3C1.1, App. Note 2.

An obstruction of justice "enhancement may not be based solely upon [the defendant's] failure to convince the jury of his innocence but rather may be based on the experienced trial judge's express finding, based on the judge's personal observations, that [the defendant] lied to the jury." United States v. Aguilar-Portillo, 334 F.3d 744, 749 (8th Cir. 2003) (citations omitted). "The district court must review the evidence and make independent finding, by a preponderance of the evidence, of perjury in order to impose a sentence enhancement for obstruction of justice." United States v. Thomas, 93 F.3d 479,

489 (8th Cir. 1996) (citation omitted).  With this standard in mind, the Court now examines each alleged instance of obstruction of justice in turn.

**b.   Alteration of Documents**

The Government claims that Ms. Pierce altered documents produced in response to a grand jury subpoena requesting production of records related to Right Step Academy and Right Group.

On July 7, 2000, Shirley Pierce printed out a revenue and expenditure report for Right Group for January 2000 through June 2000.  (Gov't Ex. 36; Sept. 29, 2005 Tr. 184.)  This spreadsheet coded lease payments for a Lincoln Navigator as "Automobile."  Although "Personal Care" was a code applied to other expenses, that code was not applied to the lease payments.

Defense Exhibit 15 is a another spreadsheet classifying income and expenses for Right Group for the 2000 tax year.  Shirley Pierce printed Exhibit 15 after receiving a grand jury subpoena in May 2002.  (Sept. 29, 2005 Tr. 186.)  On Exhibit 15, the same lease payments for the Lincoln Navigator are coded as "Personal Care" expenses.

The Government claims that Ms. Pierce gave her accountant, Tim Tjaden, the Government Exhibit 36 spreadsheet classifying expenses related to the purchase and lease of vehicles as business expenses, and that, based on this spreadsheet, Tjaden deducted the vehicle expenses as business deductions.  The

Government further claims that, after being served with the grand jury subpoena, Ms. Pierce edited the spreadsheet to properly classify those lease payments as personal expenses and then offered the edited spreadsheets as evidence at trial.

Shirley Pierce testified that she routinely edited her reports multiple times during the tax preparation process with Tjaden and that she did not alter the report in response to the grand jury subpoena.  (Sept. 29, 2005 Tr. 195-97.)

The Court concludes that the record is too inconclusive for it to find that Ms. Pierce altered records in response to the grand jury subpoena.  As the Court examines the evidence, it is just as likely that the two versions of the spreadsheet represent different editions of the document created long before the grand jury subpoena was issued.  In fact, the evidence is not clear that Tjaden did deduct the Navigator payments as business deductions for the 2000 tax year.  Thus, the Court declines to find that Ms. Pierce obstructed justice by altering the spreadsheet.

### c.    False Testimony

### i.    Reporting of Personal Expenditures

The Government further claims that Ms. Pierce obstructed justice by perjuring herself.  First, it claims that she falsely testified that she concealed personal expenditures from Tjaden because she did not want him to confuse personal expenses as business deductions on the tax returns.  (Sept. 29, 2005 Tr. 58.)  The Government contends that Ms. Pierce purposefully hid these personal

care expenses from her accountant.  It claims that Ms. Pierce's testimony that, during the time he was preparing her taxes, she trusted Tjaden as a competent, experienced CPA, demonstrates that she was lying when she stated that she removed expenses coded as personal care to avoid confusing Tjaden.  (Id. 221.)

Based on the evidence in the case and the Court's personal observation of Shirley Pierce's testimony at trial, the Court does not find that Ms. Pierce committed perjury in this instance.  The Government has not proven false Ms. Pierce's testimony that, at the time she was preparing documents for Tjaden, she had the opinion that he would be confused if she listed "personal care" expenses and might have erroneously included them as business deductions.  The jury's finding that Shirley Pierce was guilty of tax fraud does not necessitate a finding that she wilfully lied regarding her concerns about Tjaden at the time he was preparing her tax returns.

### ii.    Ms. Pierce's Knowledge of Tax Obligations

The Government also asserts that Shirley Pierce committed perjury when she testified at trial that she was unaware of her obligation to include personal expenses paid by Right Group as distribution income on her tax returns, until she learned that fact at trial.  (Sept. 29, 2005 Tr. 7.)  The Government asserts that the jury rejected this testimony as false and notes that she was an IRS employee for a substantial period of time who received training on tax laws.  (Id. 59-69.)  At the

time that she provided information to Tjaden to prepare returns, Shirley Pierce

was enrolled in a CPA test preparatory course that included instruction on tax.

(Id. 69-71.)  Ms. Pierce argues that her training did not make her an expert on tax

calculation, because she was essentially a collections agent for the IRS.

The Court concludes that the Government has proven, by a preponderance

of the evidence, that Ms. Pierce's testimony was false as to a material matter and

was a willful attempt to obstruct justice.  Ms. Pierce had extensive experience as

an IRS employee and was enrolled in a tax course.  She prepared the tax

documents upon which Tjaden based the Pierces' tax returns and submitted those

returns under penalty of perjury, and the jury found her guilty of multiple counts

of willfully filing false tax returns.  The Court personally observed Ms. Pierce's

testimony and concludes that she lied when she stated that, at the time she was

preparing the taxes in question, she was not aware of her obligations regarding

distribution income.  Based on the foregoing, the Court finds that Ms. Pierce

committed perjury.

### iii.    Testimony Regarding Life Insurance Policy

The Government alleges that Shirley Pierce testified that she never misled

Tjaden concerning the nature of a personal life insurance policy paid for with

business funds.  (Sept. 29, 2005 Tr. 24-25.)  Some of the policy was paid for with

personal funds and some of it was paid for with Right Group funds.  (Id.)  The

Government claims that she falsely told Tjaden that all of the life insurance payment came out of personal funds, when in fact, most of it had been paid for with business funds.  (Id. 153-55; Gov't Ex. 176.)

The Court notes that the issue of whether or not Shirley Pierce told the truth to Tjaden during the time he was preparing the tax returns is separate from the issue of whether she lied in Court while testifying about her thoughts and actions at that time.  The Court has reviewed Ms. Pierce's testimony and the evidence in this case finds that Ms. Pierce's testimony is too ambiguous for the Court to conclude that she committed perjury.

### iv.    Conclusion

Based on Ms. Pierce's perjury regarding her knowledge of her tax obligations, which was material to the issue of whether she was guilty of wilfully filing a false tax return, the Court concludes that the obstruction of justice enhancement applies.

### 4.    Adjusted Offense Level for Tax Offenses

Based on the Court's findings, the adjusted offense level for William Pierce is 15, as recommended in the PSI.  The adjusted offense level for Shirley Pierce is 17.

### C.    Mail and Wire Fraud Counts

### 1.    Base Offense Level

10

The PSI recommends that the base offense level for conspiracy to commit mail and wire fraud and for the mail and wire fraud counts is 6.  §§ 2F1.1(a), 2X1.1(a).  This recommendation is based on application of § 2F1.1 (fraud) as the base offense level for violations of 18 U.S.C. §§ 1341, 1343.

The Government asserts that the base offense level for Count 1, conspiracy, and Counts 5-13, mail fraud and wire fraud, should be § 2C1.7 (fraud involving the deprivation of the intangible right to the honest services of public officials; conspiracy to defraud by interference with governmental functions).  The Government asserts that the Pierces were found guilty of fraud by deprivation of honest services.  It also claims that the Pierces were public employees because they were employed in a charter school, which "is a public school and is part of the state's system of public education."  Minn. Stat. § 124D.10, subd. 7.  The statute continues, "Except as provided in this section, a charter school is exempt from all statutes and rules applicable to a school, a board, or a district, although it may elect to comply with one or more provisions of statutes or rules."  Id.

The Court concludes that the base offense level found in the PSI's is correct. §§ 2F1.1(a), 2X1.1(a).  The current version of the Sentencing Guidelines broadly defines "public officials" to include those acting on behalf of any state or local government or persons in positions of public trust to carry out government programs.  However, the earlier Guidelines applicable to the Pierces do not

contain such a broad definition, and the Court concludes that the Pierces are not

"officers [or] employees of federal, state or local government." § 2C1.7, App. Note

1.

###### 2.    Loss Amount

###### a.    Introduction

The PSI applies a 10-level enhancement to both Defendants based on a loss

of $768,758.56. § 2F1.1(b)(1)(K). The Pierces advocate for a 4-level

enhancement based on a loss of between $20,000 and $40,000. The Government

asserts that the loss is $760,758.56.

"[T]he damage wrought by fraud is sometimes difficult to calculate, so a

district court is charged with the difficult task of making a reasonable estimate of

the damages or loss." United States v. Agboola, 417 F.3d 860, 870 (8th Cir.

2005). "[T]he loss need not be determined with precision." § 2F1.1, App. Note.

9. "The court need only make a reasonable estimate of the loss, given the

available information." Id. Further, "[r]elevant conduct under the guidelines

need not be charged to be considered in sentencing." United States v. Radtke, 415

F.3d 826, 841 (8th Cir. 2005).

> Where, as here, criminal activity is jointly undertaken, relevant
> conduct is to be determined on the basis of all acts and omissions
> 'that were part of the same course of conduct or common scheme or
> plan as the offense of conviction.' U.S.S.G. § 1B1.3(a)(2). [T]he
> amount of loss charged to a particular defendant need not be limited

> to the money that [the defendant] personally handled.  Instead, the
> amount of loss may include those losses caused by reasonably
> foreseeable acts that co-workers committed to further the scheme to
> defraud.

Id. at 844 (citation omitted); see also U.S.S.G. § 1B1.3.  With this standard in mind, the Court makes the following findings regarding the loss amount.

### b.   Alleged Overbilling of Right Step by Right Group

The Government alleges that a large portion of the loss stems from Right Group Incorporated's charges to Right Step Academy.  Right Group was owned by both Shirley Pierce and William Pierce.  Right Group was hired by Right Step Academy without the informed approval of the members of the board of directors of the school regarding the conflict of interest presented by William Pierce's ownership interest.  The contract between Right Group and Right Step Academy provided for overcompensation to Right Group for its services.  However, despite the fact that this contract was tainted due to the conflict of interest, Right Group did provide some legitimate services to Right Step Academy.  Thus, the Court will calculate the loss amount as the amount that Right Step Academy paid to Right Group beyond the reasonable worth of Right Group's services.

The Government has presented evidence that a typical professional employer organization ("PEO") would charge a fee of three percent of gross payroll to an employer for its services, including payroll services, recruiting, and

human resources services. Right Group did provide those type of services to Right

Step Academy. Significantly, a PEO is also a co-employer. It assumes duties and

liabilities that Right Group did not, such as the responsibility to pay the

employees' wages, file the appropriate IRS forms, and make tax payments to the

IRS. Because Right Group did not assume any of these responsibility, in some

ways, it provided fewer services than a typical PEO.

On the other hand, the defense presented evidence that Right Group

performed additional services that a typical PEO does not, such as providing

accounts payable services, assisting Right Step with its preparation for charter

school audits, and assisting with UFARS reporting. Thus, Right Group both

provided additional services beyond those offered by a PEO, and, at the same

time, assumed less risk and responsibility than a PEO.

In order to ensure that Defendants receive full credit for all work done by

Right Group, the Court concludes that a reasonable fee would have been six

percent of gross payroll. Six percent represents twice the reasonable industry fee

for services provided by a PEO. (Although there was testimony that accounts

payable services may be paid on a fee-per-check basis, the Court does not have the

necessary information to calculate a reasonable fee on this basis.) With this

estimate, the Court gives Right Group credit for providing two sets of services -

three percent of gross payroll for providing typical PEO services plus another three

percent of gross payroll for providing an accounts payable service and audit preparation.  By crediting Right Group with the services that two separate businesses would have provided, the Court has reached a reasonable estimate of the loss amount based on the evidence in the record.  Although Right Group did provide some services that are different from both a PEO and an accounts payable service, such as UFARS reporting and charter school audit preparation, it also provided fewer services than a PEO and assumed far fewer risks and liabilities. The Government bears the burden of proof to prove loss.  The six percent figure errs on the side of giving the benefit of the doubt to Defendants.

Right Step Academy's payroll was $5,868,722.52.  Six percent of Right Step Academy's gross payroll would be $352,123.35.  This figure represents the reasonable fees to which Right Group was entitled.  Right Group's gross receipts from Right Step were $709,776.00.  (Gov't Ex. 265.  This exhibit initially overstated Right Group's gross receipts by $27,000.00, as Agent Makowski testified at the evidentiary hearing.)  Thus, Right Group overcharged Right Step by $357,652.65.  This amount constitutes a loss for which the Pierces are responsible under the Guidelines.

### c.    SBP Management Consultants

Shirley Pierce's business, SBP Management Consultants, submitted invoices to Right Step Academy, which were approved for payment by William Pierce, for

work done starting the North Carolina charter school.  Both Shirley Pierce and

William Pierce had interests in SBP.  (Gov't Ex. 34.)  SBP Management did not

have a contract with Right Step Academy, let alone a contract approved by an

informed board of directors, and its hiring represented a serious conflict of

interest.  SBP's charges to Right Step Academy represented a continuance of the

Pierce's scheme to defraud by using Right Step Academy funds for their benefit.

In 1997, Right Step paid SBP Management $16,704.00.  Although it is

possible that SBP provided some services to Right Step, the Court concludes that

this entire payment represents a loss.  This conflicted business arrangement was so

fraught with fraud and completely lacking in any contractual terms or appropriate

approval, that, on the evidence before the Court, it is impossible to draw out any

valid payments for services that were reasonably priced, provided in Right Step's

best interest, and of sufficient quality to merit payment.

### d.    Chevrolet S-10 Purchase Reimbursement

At the evidentiary hearing, Defendants stated that they do not object to the

$5,000.00 loss amount attributable to funds that the Pierces diverted from Right

Step Academy to pay for a pickup truck.  The Court includes this figure in the loss

amount.

### e.    Capital One Credit Card

Defendants do not object to the $17,561.87 loss amount attributable to the

16

Pierces' use of Right Step Academy funds to pay personal credit card debt.  The Court includes this figure in the loss amount.

### f.  Timeshare

The Government requests that the Court include Right Step's one-time payment of $602.85 for the Pierces' timeshare in Causeway on Gull.  The Court finds that this amount is not a loss attributable to the Pierces' fraud.  The timeshare was used for staff training, and this payment for the timeshare, in place of paying for a hotel or convention hall, was not a fraudulent use of Right Step funds, but rather a less expensive alternative venue for a legitimate training event.

### g.  Down Payment on North Carolina Home

The Government seeks to include a $9,500.00 payment from Right Step funds used for a down payment on the Pierces' North Carolina home.  The Court finds that this amount is not a loss due to the Pierces' fraud because this amount was likely to have been Right Step's payment of William Pierce's $9,500.00 deferred compensation, to which he was entitled under his contract with Right Step.

### h.  Timberwolves Basketball Tickets

Defendants do not object to the $11,125.00 loss amount attributable to the Pierces' use of Right Step funds to buy season tickets to the Timberwolves basketball games.  Thus, the Court includes this amount in the loss figure.

17

### i.    Excess FICA Repayments

Defendants object to the excess FICA payment of $1,030.75 returned to

William Pierce.  The Pierces took credit for excess FICA on their 1998 return, but

Right Group also repaid the FICA amount to William Pierce the next year.

Although the Pierces received funds to which they were not entitled by taking

credit for overpayment of FICA one year and then receiving the FICA repayment

the next year, the Government has not shown that this action constituted wilful

fraud rather than an innocent error caused by a new payroll system.  The Court

will not include this amount in the loss figure.

### j.    Payments to Shirley Pierce

The Court will not include as a loss the payment of $2,106.75 to Shirley

Pierce in 2000 for work done to start up the Arizona charter school.  The Court

concludes that this was a reasonable payment for her work setting up the Arizona

school, which was work performed in addition to Right Group's services provided

to Right Step for the Minnesota charter schools and the North Carolina charter

school under Right Group's contract with Right Step.  (Gov't Exs. 14-15.)

### k.    Payments to Mr. Pierce

William Pierce objects to the inclusion of a 1998 $12,500 payment to him,

documented in Government Exhibit 121, on the grounds that the payment

represented deferred compensation of $9,500 and a transportation reimbursement

of $3,000, both contemplated by his contract.  The Court finds that this amount is

not a loss due to the Pierces' fraud because this amount was likely to have been

Right Step's payment of William Pierce's deferred compensation and

transportation allowance, to which he was entitled under his contract with Right

Step.

### l.    Vending Machine Reimbursement

At the evidentiary hearing, Defendants did not object to the loss figure of

$2,058.00 attributable to vending machine reimbursement.  Additionally, the

Court has reviewed the evidence in this case, including the testimony at trial, and

concludes that this reimbursement was fraudulent.  The Court includes this

amount in the loss figure.

### m.    Grant Money

The Court will not include the $24,000.00 amount attributed to the alleged

misuse of grant money intended for computers and related equipment.  The

Government notes that witness Charlotte Burgess testified that William Pierce

used part of the grant money to purchase a new computer for himself.  (Sept. 13,

2005 Tr. 30-34.)  However, William Pierce denied using the grant money for his

personal use.  (Sept. 27, 2005 Tr. 140.)  Although the Government has provided

documentation regarding the award of this grant, there is no evidence that any

grant money was actually dispersed.  There is no record of the grant money being

transferred to Right Step Academy or to William Pierce.  Based on the record

before the Court, the Court concludes that there is insufficient evidence to

attribute any loss amount based on the alleged misuse of grant money.

### n.   Excessive Salary Paid to William Pierce

The Government asserts that William Pierce received excessive salary from

Right Step of $124,855.00.  Mr. Pierce's executive director contract with Right

Step Inc. provided for a yearly salary of $65,000.00 and annual deferred

compensation of $9,500.00.  (Gov't Ex. 10.)  Thus, it argues that any salary that

Mr. Pierce received from Right Step Academy, Right Step Inc., or Right Step-North

Carolina beyond $74,500.00 per year represent unauthorized salary payments.

The Court notes that Mr. Pierce's contract also entitled him to a

transportation allowance of $6,000.00 per year.  Although Mr. Pierce's tax forms

do not indicate that a portion of his salary was actually transportation

reimbursement, that inaccuracy could constitute tax fraud, but would not be a loss

attributable to the mail and wire fraud counts.  Thus, the Court credits Mr. Pierce

an additional $6,000.00 per year for transportation reimbursement.

Furthermore, William Pierce's contract provided him with a yearly stipend

of $5,000.00 for miscellaneous expenses such as school receptions, fund-raising

solicitations, and duties associated with professional organizations.  Although his

tax forms did not denote any of his compensation as being a stipend, this potential

inaccuracy is related to tax fraud, not mail and wire fraud.  The Court thus credits

Mr. Pierce with an additional $5,000.00 per year for his contractually permitted

stipend.  In total, Mr. Pierce was entitled to compensation of $85,500.00 per year

from Right Step Academy and Right Step Inc.

Although Mr. Pierce's, 2000 W-2 does not differentiate salary received from

Right Step-North Carolina from salary received from Right Step Academy and

Right Step Inc., his 1998 and 1999 W-2's do.  Mr. Pierce's contract with Right Step

Inc. did not clearly include his duties for Right Step-North Carolina.  Because the

contractual salary set forth in Government Exhibit 10 does not clearly include Mr.

Pierce's work for both the Minnesota schools and the North Carolina school, the

Court does not include the $20,000.00 payments that Mr. Pierce received for work

for Right Step-North Carolina in 1998 and 1999 in its excessive salary

compensation.

Thus, Mr. Pierce received $99,408.46 from Right Step Inc. and Right Step

Academy in 1998.  He was entitled to payments totaling $85,500.00.  He received

$13,908.46 in excessive salary for 1998.

Mr. Pierce received $107,047.08  from Right Step Inc. and Right Step

Academy in 1999.   He was entitled to payments totaling $85,500.00.  He received

$21,547.08 in excessive salary for 1999.

Mr. Pierce received $101,900.00 from Right Step Inc. and Right Step

Academy in 2000.  He was entitled to payments totaling $85,500.00.  He received

$16,400.00 in excessive salary for 2000.

Mr. Pierce received a total of $51,855.54 in excessive compensation.  The

Court includes this amount in the loss total.

### o.   Total Loss amount

The total loss amount is as follows:

| Loss Amount | Explanation |
| --- | --- |
| $357,652.65 | Overbilling by Right Group |
| $16,704.00. | SBP Management |
| $5,000.00 | Chevrolet S-10 Purchase Reimbursement |
| $17,561.87 | Capital One Credit Card |
| $11,125.00 | Timberwolves Basketball Tickets |
| $2,058.00 | Vending Machine Reimbursement |
| $51,855.54 | Excessive Salary Paid to William Pierce |
|  |  |
| **$461,957.06** | **TOTAL LOSS AMOUNT** |

Based on a total loss amount of $461,957.06, each Defendant receives a

nine-level enhancement based on a loss of more than $350,000.00.  U.S.S.G.

§ 2F1.1(b)(1)(J).

### 3.   Planning Enhancement

The PSI applies a 2-level enhancement to both Defendants for more than

minimal planning because the offense spanned four years and involved repeated

instances of fraud.  § 2F1.1(b)(2)(A).  Defendants object to this enhancement.

William Pierce asserts that he did not plan the fraud, but merely did his best to

provide a community service and failed to employ the best techniques.  Shirley

Pierce asserts that the fraud did not involve any elaborate schemes or

concealment.

"'More than minimal planning' means more planning than is typical for

commission of the offense in a simple form."  U.S.S.G. § 2F1.1, App. Note 2;

§ 1B1.1, App. Note 1(f).  It "is deemed present in any case involving repeated acts

over a period of time, unless it is clear that each instance was purely opportune."

Id.  In this case, the Pierces repeatedly committed fraud by diverting funds from

Right Step over a period of years.  They diverted funds in a number of different

manners, such as overpaying businesses in which they had an interest either after

an uninformed board approval, in the case of Right Group, or without any

approval at all, in the case of SBP Management.  They repeatedly paid off their

personal credit card debt and issued excess salary payments to William Pierce for

three different years.  By repeating the fraud multiple times and in various

manners, including schemes that required the use of separate companies, such as

Right Group or SBP, Defendants employed more than minimal planning to commit

their crimes.  Thus, the Court will apply the 2-level enhancement to both

Defendants.

### 4.    Sophisticated Means

The PSI applies a 2-level enhancement for sophisticated means because Defendants funneled funds from Right Step Academy by using SBP Management and Right Group, entities that they both controlled.  § 2F1.1(b)(6)(C).  It reasons that Defendants also falsified documents and put friends and family on the Right Step Academy board of directors because they would not question Defendants' motives.

The Court concludes that Defendants did not employ "especially complex or especially intricate offense conduct pertaining to the execution or concealment of" the offenses.  § 2F1.1, App. note 18.  This enhancement "requires conduct that is significantly more complex or intricate than the conduct that may form the basis for an enhancement for more than minimal planning under subsection (b)(2)(A).  Id.  "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts also ordinarily would indicate sophisticated means."  Id.

In this case, the Pierces made minimal attempts to cover their tracks regarding the payments to Right Group or the Pierces.  There were no offshore accounts, shell corporations, or forged signatures.  They did not conceal assets.  Merely having shoddy record-keeping making it difficult for the Government to

calculate loss is not grounds for this enhancement.  See United States v. Hart, 324

F.3d 575, 579-80 (8th Cir. 2003).  Also, the evidence does not prove that the

Pierces placed personal allies on the Right Step board for the purpose of aiding

their fraudulent scheme.  Thus, the Court will not apply the sophisticated means

enhancement to either Defendant.

### 5.    Victim-Related Adjustments

The PSI did not apply the vulnerable victim enhancement because the direct

victims of the fraud were the Minnesota Department of Education and the St. Paul

School District, who cannot be considered vulnerable.  It declined to apply an

enhancement for the indirect victims, the students and parents of Right Step

Academy.  The Government asserts that a two-level enhancement for vulnerable

victims should be applied to each Defendant because the Right Step Academy

students were deprived of an adequate education through Defendants' actions.

§ 3A1.1.

The Court concludes that the vulnerable victim enhancement is not

applicable.  The Government failed to show that the Right Step Academy students

were vulnerable victims of the Pierces' crimes for guideline purposes.  In order to

apply this enhancement, the Court must find that the students' particular

characteristics, such as youthfulness and poverty, made them "unusually

vulnerable" to the Pierces' conduct and that the Pierces knew or should have

known of this unusual vulnerability.  United States v. Anderson, 349 F.3d 568, 572-73 (8th Cir. 2003).

Although the students were academically at risk, the Government failed to show how the Pierces' conduct exploited that vulnerability.  The students were not the direct victims of the Pierces' fraud, and, in fact, the Government could not show how enrollment at Right Step Academy harmed these students.  The Government's evidence could not show that the students' situation at Right Step Academy was any worse than their educational settings before or after the existence of Right Step Academy.  It could not show that students' test scores improved or declined after enrollment at Right Step.  Simply providing evidence regarding test scores of eleven out of one hundred and sixty-one Right Step Academy students who entered the St. Paul public schools after Right Step closed, without explaining their testing when they entered Right Step Academy, fails to show that those eleven students were harmed.  The evidence could not show how long some of those students had been enrolled at Right Step.  Additionally, the percentage of those students who failed to pass all three of the basic skills tests is not far different from the failure percentage of African-American students in the alternative school setting in St. Paul public schools.  This information is particularly unhelpful when some of the students still have the opportunity to pass those tests before graduation.

Additionally, the Government provided no comparison to, for example St. Paul public schools, when it presented evidence regarding the lack of textbooks in a particular classroom or the "chaotic" atmosphere in the Right Step elementary school.  However, the Government's witness did testify that Right Step provided an environment in which the adults cared about the students.  Also, Right Step provided role models to their African-American students through a staff and administration that was largely African-American.  Because the Government did not show that the Pierces' fraud harmed the students or that the students were usually vulnerable to their conduct, the Court concludes that this enhancement is not applicable in this case.

### 6.    Role in the Offense

The PSI applies a 2-level enhancement to Mr. Pierce on the grounds that he abused a position of public trust in a manner that significantly facilitated the commission and concealment of the offenses because he was the president and director of a public charter school with substantial discretionary judgment. § 3B1.3.  Mr. Pierce does not object to this enhancement.  The Court will apply the enhancement to William Pierce.

The PSI also recommends applying this 2-level enhancement to Shirley Pierce on the grounds that she was the president and owner of Right Group which was used to divert funds from Right Step Academy.   Ms. Pierce objects to this

enhancement on the grounds that the school board and the St. Paul school district did not place trust in her.

This enhancement applies only if the "defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."   § 3B1.3.  Thus, the "enhancement applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim." United States v. Trice, 245 F.3d 1041, 1042 (8th Cir. 2001) (citation omitted).

Although Shirley Pierce may have had significant discretionary authority as the president of Right Group, Right Group was not the victim of Shirley Pierce's crimes.  The State of Minnesota, the St. Paul School District, even Right Step itself, were all victimized by her actions, but none of those entities entrusted her with discretionary authority.  An arm's length business relationship does not give rise to this enhancement.  The Court will not apply this enhancement to Ms. Pierce because she was not in a position of trust vis-a-vis the victims of her crimes.

### 7.   Obstruction of Justice

#### a.   PSI

The PSI did not apply an enhancement for obstruction justice because the trial transcript was not available at the time that the PSI was prepared.  The Government asserts that this enhancement applies to both Defendants because

28

they both committed perjury when testifying in relation to the mail and wire fraud charges.

### b.    William Pierce

#### i.    Reimbursement Approval

The Government asserts Mr. Pierce falsely testified that a $13,218.42 reimbursement, identified in Government Exhibit 22, was approved before distribution.  (Sept. 28, 2005 Tr. 25-37.)  The evidence showed that he deposited the check into his personal account before formal approval.  (Id. 30-37.)  The Court observed Mr. Pierce's testimony and has reviewed the transcript.  When his testimony is reviewed in the context of an extended cross examination, it is too ambiguous to constitute perjury.  His statements appear to be the result of confusion and misstatements, which he attempted to correct.  The Court finds that William Pierce did not commit perjury in this instance.

#### ii.    Arizona Expenses

Mr. Pierce testified that expenses related to a Scottsdale Arizona resort were related to acquiring an Arizona charter school.  (Sept. 28, 2005 Tr. 106-07.)   The Government claims, without citation to the record, that these expenses were actually related to a personal vacation with a co-worker at the resort.  The Court finds that there is insufficient evidence that Mr. Pierce's testimony was false.  Rather, Mr. Pierce was confused regarding the purpose of that payment.

29

### iii.   Timberwolves Tickets

William Pierce testified that his Timberwolves tickets were an expenditure made in the best interest of the school.  (Sept. 28, 2005 Tr. 114-17.)  He also testified that these tickets were his personal tickets that he would sometimes share with other members of Right Step.  (Id. 114.)  The Court finds that Mr. Pierce committed perjury when he testified that he believed the purchase of his Timberwolves tickets was in the best interest of the school.  (Id. 117.)  When writing check for purchase of Timberwolves tickets, he wrote that the checks were for "Student Activities."  (Gov't Ex. 77-78.)  However, students did not use these tickets; these were William Pierce's personal tickets.  (Sept. 28, 2005 Tr. 116.)  He spent over eleven thousand dollars of Right Step's funds on Timberwolves tickets. He mislabeled the tickets as being for student activities, yet treated them as his personal tickets, to occasionally be shared with other Right Step employees when he could not use the tickets.

Reviewing this evidence and having personally observed Mr. Pierce's testimony, the Court concludes that his statement was materially false.  William Pierce spent a large amount of the school's money on season tickets to professional sporting events for his own use, yet mislabeled the tickets to make it appear that the tickets were for student use and conceal his fraud.  Based on the foregoing, the Court concludes that he blatantly lied when he testified that he believed that

expenditure was in Right Step's best interest.

### iv.   Computer Grant

Finally, Mr. Pierce testified that his personal computer was not purchased by the school.  (Sept. 27, 2005 Tr. 140.)  Charlotte Burgess testified that he used school computer grant money to purchase his personal home computer.  (Sept. 13, 2005 Tr. 32-34.)  The Government asserts that Mr. Pierce's testimony constituted perjury.  As the Court discussed in section III(C)(2)(m), addressing the loss amount, there is insufficient evidence to conclude that Mr. Pierce misused the computer grant money.  There is no evidence that any grant money was actually dispersed or that any grant money was transferred to Right Step Academy or to William Pierce.

Based on William Pierce's perjury regarding the Timberwolves tickets, the Court will apply the obstruction of justice enhancement.

### c.   Shirley Pierce

### i.   Falsification of Check Cover Sheets

Ms. Pierce testified that she did not instruct her employees to backdate check cover sheets in preparation for the audit; rather she cast the blame on Right Step.  (Sept. 29, 2006 Tr. 136-41.)  However, multiple witnesses testified that Ms. Pierce directed them to prepare backdated forms for checks.  (See Testimony of Tiffany Harmon, Sept. 14, 2006 Tr. 53; Cherisse Turner, id. 100.)  The Court

31

personally observed Ms. Pierce's testimony.  Based on the Court's observation and the multiple witnesses whose testimony contradicted Ms. Pierce's, the Court finds that Ms. Pierce committed perjury by wilfully lying about this material fact.

### ii.    Payment to Wilberforce Academy

Ms. Pierce testified that a $3,000 tuition payment to Wilberforce Academy was a deferred salary payment to her son.  (Sept. 29, 2006 Tr. 155.)  The Government alleges that Ms. Pierce represented this payment as a business expense to Tjaden.  However, her son had already received his salary before the payment was made to Wilberforce.  (Id. 155-61.)  Ms. Pierce argues that the check to her son was put into the system for tax and payroll purposes but was never cashed.  However, Shirley Pierce personally wrote one $734.12 check to her son that was endorsed by him, and two additional $734.12 checks on which she wrote that the checks to her son were void because the amount of the checks was wired to him.  (Gov't Ex. 253.)  She knew that the Wilberforce payment was not a salary payment to her son because much of his salary had already been paid to him. Based on the Court's review of the evidence and its observation at trial, it finds that Ms. Pierce committed perjury when she stated that the tuition payment was deferred salary to her son.

Based on Ms. Pierce's perjury regarding the falsification of check cover sheets and the payments to Wilberforce Academy, the Court concludes that the

two-level obstruction of justice enhancement applies to Ms. Pierce.

### 8.    Total Offense Level

#### a.    William Pierce

The total offense level for William Pierce for the mail and wire fraud group is 21.  This calculation is derived as follows:

| Guideline Section | Amount |
| --- | --- |
| Base Offense Level | 6 |
| Loss Enhancement | +9 |
| More than Minimal Planning | +2 |
| Abuse of Trust | +2 |
| Obstruction of Justice | +2 |
| **Total Offense Level** | **21** |

#### b.    Shirley Pierce

The total offense level for Shirley Pierce for the mail and wire fraud group is 19.  This calculation is derived as follows:

| Guideline Section | Amount |
| --- | --- |
| Base Offense Level | 6 |
| Loss Enhancement | +9 |
| More than Minimal Planning | +2 |
| Obstruction of Justice | +2 |
| **Total Offense Level** | **19** |

### D.    Final Total Offense Level

The higher group offense levels, for the mail and wire fraud group, controls for each Defendant. § 3D1.3. The Court rejects Shirley Pierce's assertion that, due to the Pinkerton instruction, she should be sentenced under the tax group offense level. As the Court already indicated, it has included Count I, conspiracy, in both offense groups because, "were it sitting as a trier of fact, [it] would convict the defendant[s] of conspiring to commit" each of the three object offenses. U.S.S.G. § 1B1.2, App. Note 4. Additionally, the jury unambiguously found Shirley Pierce guilty of Counts 5-13 and she is responsible for her acts and omissions that were part of the same common scheme as those offenses of conviction and for the reasonably foreseeable acts and omissions of William Pierce in furtherance of that scheme. § 1B1.3.

### E.   Criminal History

There are no objections to the PSI's finding that both Defendants have zero criminal history points.

### F.   Restitution

The PSI calculates restitution at $434,608.25 to the State of Minnesota, Minnesota Department of Education, due jointly and severally from both Defendants. Both Defendants object. William Pierce asserts that the State was not a victim of his crimes, and both Defendants object to the amount of restitution requested.

34

The Court finds that the State of Minnesota is entitled to restitution because it was a victim of the Pierces' fraud.  18 U.S.C. § 3663A(c)(1)(A)(ii).  A victim is

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).  "[A] district court may award restitution to individuals who suffered from a defendant's criminal activity beyond what was described with particularity in the indictment, so long as the indictment details a broad scheme encompassing transactions beyond those alleged in the counts of conviction." United States v. Bush, 252 F.3d 959, 963 (8th Cir. 2001) (quoting United States v. Manzer, 69 F.3d 222, 230 (8th Cir. 1995)).  "Because a scheme or artifice to defraud is an essential element of the offenses of both mail and wire fraud, a conviction for mail or wire fraud can support a conviction for a broad scheme regardless of whether the defendant is convicted for each fraudulent act within that scheme." Manzer, 69 F.3d at 230.

In this case, the Indictment alleges in Count I, conspiracy, that the Pierces fraudulently obtained money and property belonging to the State of Minnesota. Indictment ¶¶ 8(b)(1); 8(b)(2); 9.  Additionally, they were convicted of mail and wire fraud counts, each of which includes a scheme or artifice to defraud.  An

essential part of the Pierces' scheme was to obtain funds from the State of

Minnesota for Right Step and then to divert portions of that money to their own

use.  The Pierces' fraudulently used Right Step funds for their own benefit - for

example, to pay their personal credit cards - and Right Step received most of its

funds from the State of Minnesota.  The State was a direct victim of the Pierces'

crimes because Right Step Academy received money from the State authorized

only for particular uses, diverted those funds from their proper use, and did not

repay the State.

"[T]he district court has wide discretion in ordering restitution."  United

States v. Ross, 210 F.3d 916, 924 (8th Cir. 2000).  At the evidentiary hearing,

Audrey Bomstad of the finance division of the Minnesota Department of Education

testified regarding the loss to the State of Minnesota.  Based on that testimony and

the evidence presented at the hearing, the Court finds that Defendants owe, jointly

and severally, restitution in the amount of $489,239.65 to the State of Minnesota,

Minnesota Department of Education.

The Court rejects Defendants' argument that the State is not entitled to

restitution for this amount because, while Right Step was unable to supply the

state with audited proof that the funds were put to a legitimate use, these funds

were properly used.  While it is possible that the federal funds were put to their

intended use, Right Step bore the burden of providing audited expenditure figures

36

for the federal funds to the State.  Without providing these audited records, the State, and the Court, have no way to know if, for example, Title I funds were properly used or were improperly diverted.  Defendants' insinuation that an expenditure may have simply been mis-coded, not misused, is insufficient.  Right Step accepted these funds with the condition that audited expenditure records would be provided.  When Defendants failed their obligation to provide the State with the audited records that were required for Right Step to be entitled to keep the advanced funds, the State was entitled to collect those amounts as overpaid.

As for the state program funds, Right Step and the Pierces received funds to which they were not entitled, used those funds for a purpose other than their intended purpose, and failed to repay the funds to the State.  Their fraudulent scheme not only involved taking funds to which they were not entitled, but their conduct deprived Right Step of its own funds needed to repay the State, to use the funds properly, to conduct the required audits, or to continue to operate as a charter school.

Right Step failed to return the overpaid funding to the State.  These amounts are a loss to the State.  The State had no additional obligation to independently investigate if the funds were, in fact, used for educational purposes if Right Step failed to supply required documentation.  The Court concludes that the State is entitled to restitution in the full amount requested, $489,239.65.

The Court further determines that the State's decision to dismiss its claim against the Pierces without prejudice in the state lawsuit is not relevant to the calculation of the amount of restitution that the Pierces owe.  Should the Department refile its claim against the Pierces and recover a judgment, the Pierces' restitution obligation may be reduced.  18 U.S.C. § 3664(j)(2).  At this juncture, however, the State has not collected any of the restitution amount.

### G.    Miscellaneous Factual Objections

Defendants raise numerous objections that are attached to the PSI, that were not included in their sentencing position papers or addressed at the evidentiary hearing.  These factual objections do not affect the Guideline calculations in this matter.  The Court addresses the miscellaneous objections to the extent that they have not been withdrawn or previously addressed in this Order.  It does not address objections attached to the PSI that were subsequently withdrawn in the sentencing position papers or at the evidentiary hearing.

### 1.    Shirley Pierce's Objections to the PSI

#### a.    Objection Number 4

Shirley Pierce objects to the amount of tax loss contained in the PSI on the grounds that it is different from the amount agreed upon by the IRS and testified to at trial.  However, this objection does not impact the guideline range for the tax fraud counts: in her sentencing position paper, Ms. Pierce asserts that the PSI

offense level calculation for the tax fraud counts is correct.  The Court has reviewed the evidence in this matter and personally observed the trial and concludes that the PSI is correct.

### b.      Objection Number 11

Shirley Pierce objects that Right Step Academy did not fail throughout its period as a charter school on the grounds that early audits and reviews of the school were positive.  The Court has reviewed the evidence in this matter and personally observed the trial and concludes that the PSI is correct.

### c.      Objection Number 12

Shirley Pierce objects to Paragraph 14 of the PSI regarding falsification of check cover sheets.  The Court agrees that although Ms. Pierce directed the backdating of check cover sheets, no checks were backdated.  However, having reviewed the evidence in the case and personally observing the trial, the Court concludes that the remainder of Paragraph 14 of the PSI is correct.

### d.      Objection Number 13

Shirley Pierce objects to the PSI's description of the reason for revocation of the Right Step Academy charter.  The Court has reviewed the evidence in this matter and personally observed the trial and concludes that the PSI is correct.

### e.      Objection Number 14

Shirley Pierce objects to the implication that she submitted erroneous

information to the tax preparer in order to lower the Pierces' tax burden.  The

Court has reviewed the evidence in this matter and personally observed the trial

and concludes that the PSI is correct.

### f.      Objection Number 15

Shirley Pierce objects to the inclusion of information regarding the Pierces'

marital difficulties and counseling.  Ms. Pierce does not object that this

information is inaccurate.  Her objection is denied, and the Court will determine

the relevancy of this information upon sentencing.

### 2.      William Pierce's Objections to the PSI

### a.      Objection Number 4

William Pierce objects to the amount of tax loss contained in the PSI on the

grounds that it is different from the amount agreed upon by the IRS and testified

to at trial.  However, this objection does not impact the guideline range for the tax

fraud counts: in his sentencing position paper, Mr. Pierce asserts that the PSI

offense level calculation for the tax fraud counts is correct.  The Court has

reviewed the evidence in this matter and personally observed the trial and

concludes that the PSI is correct.

### b.      Objection Number 7

William Pierce objects to the two-level tax fraud enhancement for failing to

report or correctly identify the source of income exceeding $10,000 in any year

from criminal activity. § 2T1.1(b)(1). However, in his sentencing position paper,

he asserts that the PSI offense level calculation for the tax fraud counts is correct.

The Court considers this motion to have been withdrawn.

### c.      Objection Number 11

William Pierce objects that Right Step Academy did not change its name

and that Right Step, Incorporated, was an umbrella for various entities. He also

objects that the school charter law did not require that the elementary school be

located in the sponsoring district. The Court has reviewed the evidence in this

matter and personally observed the trial and concludes that the PSI is correct.

### d.      Objection Number 12

William Pierce objects to many of the problems cited in the on-site review

report. The Court has reviewed the evidence in this matter and personally

observed the trial and concludes that the PSI is correct.

### e.      Objection Number 13

William Pierce objects that the St. Paul school district voted to extend the

Right Step Academy charter for one year after an on-site review and then revoked

that charter due to lack of documentation. The Court has reviewed the evidence

in this matter and personally observed the trial and concludes that the PSI is

correct.

### f.      Objection Number 14

William Pierce objects that Right Step Academy did not fail throughout its period as a charter school.  The Court has reviewed the evidence in this matter and personally observed the trial and concludes that the PSI is correct.

### g.    Objection Number 15

William Pierce objects to the PSI's statements regarding revocation of Right Step Academy's charter.  The Court has reviewed the evidence in this matter and personally observed the trial and concludes that the PSI is correct.

### h.    Objection Number 16

William Pierce objects to the PSI's statement regarding displacement of Right Step Academy students.  Having reviewed the evidence in the case and personally observing the trial, the Court concludes that the PSI is correct.

### i.    Objection Number 17

William Pierce objects to the PSI's recounting of Shirley Pierce's falsification of check cover sheets.  The Court agrees that although Ms. Pierce directed the backdating of check cover sheets, no checks were backdated.  However, having reviewed the evidence in the case and personally observing the trial, the Court concludes that the remainder of Paragraph 14 of the PSI is correct.

### j.    Objection Number 18

Williams Pierce objects to the inclusion of information regarding the Pierces' marital difficulties and counseling.  He does not assert that this information is

inaccurate.  His objection is denied, and the Court will determine the relevancy of

this information upon sentencing.

Accordingly, **IT IS HEREBY ORDERED**:

1.      The applicable guidelines for Defendant Shirley Pierce are as follows:

Total Offense Level:              19
Criminal History Points:          0 (Category I)
Imprisonment Range:               30 to 37 months
Supervised Release:               2 to 3 years
Fine Range:                       $6,000 to $60,000
Special Assessment:               $1,300

2.      The applicable guidelines for Defendant William Pierce are as

follows:

Total Offense Level:              21
Criminal History Points:          0 (Category I)
Imprisonment Range:               37 to 46 months
Supervised Release:               2 to 3 years
Fine Range:                       $7,500 to $75,000
Special Assessment:               $1,300

3.      Defendant Shirley Pierce owes restitution in the amount of
        $489,239.65 to the State of Minnesota, Minnesota Department of
        Education, jointly and severally with William Pierce.

4.      Defendant William Pierce owes restitution in the amount of
        $489,239.65 to the State of Minnesota, Minnesota Department of
        Education, jointly and severally with Shirley Pierce.

Dated: _May 18, 2006_                              _s/Michael J. Davis_____
                                                   Judge Michael J. Davis
                                                   United States District Court